127 So.2d 297 (1961)
James L. SPIVEY
v.
AETNA CASUALTY & SURETY COMPANY.
No. 21607.
Court of Appeal of Louisiana, Fourth Circuit.
February 20, 1961.
Rehearings Denied March 13, 1961.
Certiorari Denied April 24, 1961.
Adams & Reese, John T. Cooper, New Orleans, for defendant and appellant.
Dodd, Hirsch, Barker & Meunier, Wilfred H. Boudreaux, Jr., New Orleans, for plaintiff and appellee.
Before JANVIER, REGAN and YARRUT, JJ.
REGAN, Judge.
Plaintiff, James L. Spivey, employed as a roustabout, instituted this suit against the defendant, Aetna Casualty and Surety Company, insurer of H. B. Hughes, his employer, endeavoring to recover maximum workmen's compensation for permanent and total disability, resulting from a heart attack which he asserts was incurred on November 8, 1957, when he attempted to move a water pump, weighing approximately *298 300 or 400 pounds. Plaintiff further prayed for statutory penalties and attorney's fees.
Defendant pleaded various exceptions which were abandoned and then answered, admitting the occurrence of the accident but denied that plaintiff had incurred a heart attack as a result thereof. In the alternative, the defendant requested that it be credited with compensation[1] and medical expenses[2] previously paid.
From a judgment in favor of plaintiff at the rate of $35 per week, not to exceed 400 weeks, subject to a credit for nine weeks compensation paid in the amount of $315, attorney's fees in the amount of $2,000, and medical expenses in the sum of $1,000, less a credit for such previously paid, defendant has prosecuted this appeal.
Pending this appeal, the plaintiff died on September 24, 1960; his widow, the administratrix of his succession, Mrs. Maudie Pearl Spivey, was substituted in his stead.
At the inception of this opinion we feel compelled to remark that all of the evidence appearing herein, including more than 250 pages of medical testimony, was adduced through the medium of depositions, some of which were unnecessarily laborious and repetitious. In view of the nebulous nature of this case and the fact that the conclusions reached herein by the trial court were predicated on the depositions hereinabove referred to, we feel constrained to quote therefrom more liberally than usual.
The record reveals plaintiff's[3] husband, age 47, had been employed for a little over a year by H. B. Hughes Construction Company as a "roustabout" whose primary duty was to operate a water pump. Fresh water was transported by barge to Venice, Louisiana. A gasoline pump, mounted on wheels weighing between 300 and 400 pounds, was used by him to pump water from the transporting barge to a smaller one, to expedite the filling of water towers. Usually, two to four men were required to complete this operation as the pump, together with four large hoses, had to be moved manually onto the deck of the water barge.
On November 8, 1957, as was his practice in the past, plaintiff requested his foreman, Harvey Lee, to supply additional men to assist him in moving the pump. He was told there was no one available, and: "You will have to move it yourself." In any event, he did move the pump and, as a result thereof, incurred a severe pain in his left chest. He promptly informed the supervisor thereof who advised him to visit a doctor. He selected Dr. James T. Reeves whose office was nearby in Buras, Louisiana.
Lee corroborated plaintiff's testimony in that he usually sent two to six men to help move the pump, and on this occasion he told plaintiff he had no one available. He admitted that "moving the pump" was not a "one-man job" and that plaintiff had promptly reported the accident. He did not admit telling plaintiff to move the pump unassisted, however, he thought plaintiff had tired of waiting for help, so he moved it himself.
Plaintiff testified that his injury was diagnosed by Dr. Reeves as a "pulled muscle". He was treated for about three weeks with heat and medicine to alleviate his pain.
During this time plaintiff continued to work, but was given a much easier job. It was no longer necessary to move the pump as longer hoses had been attached thereto, so plaintiff's work principally consisted of observing the gauges thereon. He worked 12 hours a day, alternating midnight to noon *299 shifts, seven days a week, and continued to receive his former wage of $400 monthly.
On the 24th of February, 1959, shortly before midnight, he had such severe pains in his chest that he was unable to report for work, nor did he ever return thereto. The next day he reported to H. B. Hughes who advised him to consult another physician. Upon the recommendation of a friend, plaintiff visited Dr. Casimir Di Cristina.
Dr. Di Cristina hospitalized plaintiff in the Montelepre Hospital for about three weeks. His diagnosis was that plaintiff had fractured a rib and treatment was initiated therefor. He appeared to progress satisfactorily and, on March 14th, he was told that he could leave the hospital for two weeks. He then visited his home in Cayuga, Texas.
Plaintiff, whose testimony was both convincing and impressive, related that he had never obtained permanent relief from his chest pain and as a result thereof, he was compelled thereby to consult Dr. John W. Gibson, a general practitioner, residing in Athens, Texas. Dr. Gibson, following a thorough examination, informed him that he had suffered a heart attack on November 8, 1957, and treatment therefor was begun immediately. At the time that Dr. Gibson's deposition was taken on September 24, 1959, plaintiff was still under his care. Plaintiff died on September 24, 1960, apparently from a heart disorder. This information was elicited from respective counsel by interrogation of the court, since no certificate of death appeared in the record.
Dr. Reeves, a general practitioner, whom we have already referred to hereinabove, appeared on behalf of defendant and related that clinically, and through the medium of one X-ray, he had examined plaintiff on November 8, 1957, and was of the opinion that he was suffering from a "pulled muscle," and that no rib fracture was revealed by his X-ray. Heat treatment and empirin for pain were prescribed.
Dr. Reeves was shown X-rays made at the suggestion of Dr. Di Cristina, and he testified that one X-ray showed a fracture at the junction of the rib with the cartilage of the 4th rib. He also reviewed an electrocardiogram made at the Montelepre Hospital, and asserted that he saw nothing unusual about it, but very cautiously emphasized that he was not an expert in the field of radiology.
In concluding his deposition, Dr. Reeves restated his diagnosis of a "pulled muscle", which he said generally heals in a couple of weeks, and if plaintiff had incurred a rib fracture, this would require about six to eight weeks to heal. This testimony was elicited from him since plaintiff continued to suffer from chest pains long after a "pulled muscle" or "rib fracture" would normally have healed. He conceded that symptoms exhibited by a pulled muscle are some of the same ones pertinent to a diagnosis of "cracked" cartilage, arteriosclerosis or coronary occlusion.
Dr. Di Cristina, also a general practitioner, appeared on behalf of defendant and testified that he initially examined plaintiff on February 25, 1958, and hospitalized him from February 26th to March 14, 1958, at which time he was discharged and instructed to return as an "office patient." Various examinations and tests were made which included a blood series, an electrocardiogram, X-rays, and cholesterol tests. The cardiogram reflected a normal heart. The first chest X-ray taken on February 25th revealed a heart of normal size and a fracture of the cartilage of the 4th rib, left side.
Dr. Di Cristina expressed the opinion that the plaintiff did not have a myocardial infarction, thrombosis or occlusion; however, he conceded that it was possible that plaintiff's effort to pull the pump may have caused a coronary occulsion or it may have caused a small myocardial infarction, but his diagnosis of a fractured rib, he insisted, was based on objective evidence.
Dr. I. L. Robbins, an internist experienced in the reading of electrocardiograms, also testified on behalf of the defendant. He expressed *300 the opinion that the cardiogram taken of plaintiff at the request of Dr. Di Cristina was within normal limits and therefore revealed no myocardial infarction; however, he very carefully emphasized that he was unable to conclude from one cardiogram that the plaintiff did or did not have a myocardial infarction within the last two months; hence the diagnosis of myocardial infarction could be correct.
Dr. John W. Gibson appeared on behalf of plaintiff and related that he first saw the deceased on March 18, 1958, or about four months after the accident, having been referred to him by attorneys in Athens, for the purpose of determining the extent and nature of his disability. Several days were consumed in acquiring the history of the injury, routine physical examinations, X-rays, electrocardiograms and cardiac tolerance tests. In conformity with plaintiff's account of his previous medical treatment he stated his examination had been directed primarily toward ascertaining the existence of a healed rib fracture or dislocation, however, he found no evidence of either. He further stated that if either had occurred on November 8, 1957, evidence thereof would appear on the X-rays. He also emphasized that he was unable to comprehend how plaintiff could have fractured a rib by a "pulling action", in fact, he said, "I've never heard of such a thing."
Dr. Gibson further asserted that he had taken several cardiograms and they were borderline, and not helpful to him in making a diagnosis; he agreed with Dr. Robbins, that a cardiogram is at best a very good diagnostic aid. The tolerance test, however, was compatible with the ultimate diagnosis of coronary insufficiency which took him three weeks to make. He related that plaintiff's complaint of shortness of breath was the same from the first day he saw him until the last time he had seen him, which was the the day before the doctor's deposition was taken on September 24, 1959. He pointed out that plaintiff was not responsive to treatment, and "he remains a cardiac cripple;" he believed the exertion on November 8, 1957, precipitated a coronary thrombosis and this evaluation of plaintiff's condition was made "with reasonable medical certainty, and not the conclusions drawn (from) one visit but by a multitude of visits."
Dr. Gibson asserted that arteriosclerosis was compatible with plaintiff's chronological age, but was of the opinion that he was more active than his pathological age permitted. "His pre-existing condition, coupled with the exertion he went through at the time of the accident caused this thing to happen. I think he had a blood clot."
The X-rays and cardiogram taken by Dr. Di Cristina were shown to Dr. Gibson. He testified he saw no fracture in any of them. He also reviewed the cardiogram and conceded that it reflected no abnormality. He related that three out of the four cardiograms he had taken of plaintiff's heart were normal, and only the last one revealed myocardiac change; he said diagnoses based on electrocardiograms are not conclusive; more reliable had been the exercise tolerance tests which he had administered; they had indicated a low cardiac reserve. It is very interesting to observe that on September 24, 1959, in the course of his deposition, Dr. Gibson ominously predicted: "I'll give him about another two years, with luck." Plaintiff died a year later or on September 24, 1960.
Dr. Kenneth G. Nix, a specialist in internal medicine, which included a practice of cardiology, was engaged by defendant's counsel to examine plaintiff on May 20, 1959. He was furnished the reports of Drs. Reeves, Di Cristina, and Gibson. He submitted a lengthy and detailed report to defendant on June 16, 1959.
In the report he related that plaintiff had told him of the sudden severe pain over the left side of his chest on November 8, 1957, which was a "tearing" type pain, severe shortness of breath and severe weakness. Plaintiff had no complaint of chest pain prior to November 8th, no previous history of hypertension, cardiac disease or lung *301 disease, diabetes, and no previous injury or operation.
Dr. Nix conducted a very thorough examination, which included electrocardiograms, fluoroscopes, X-rays, and attempted to give the Masters exercise tolerance test. Before this test is administered, the patient exercises by hopping, and walking rapidly up and down stairs. Plaintiff was unable to complete "the work-up" as he experienced severe pain; however, tracings were taken two minutes later and six minutes later and the results were indicative of coronary disease and coronary insufficiency.
The cardiograms revealed an old anteroseptal myocardial infarction. The flouroscopic examination revealed an enlargement of the left ventricle of the heart; the X-rays revealed no evidence of old or recent fractures involving the ribs or any evidence of a callus formation, such as the X-rays of Dr. Di Cristina assertedly reflected.
In summarizing his evaluation of plaintiff's condition, Dr. Nix expressed the opinion that: "* * * this patient undoubtedly had a coronary occlusion on the 8th of November, 1957, and since that time has continued to have definite evidence of coronary artery disease producing an anginal syndrone. * * *
"After a careful review of the past events involved in the accident which occurred on November 8, 1957, and of the data which has been accumulated during the past 16 months, I would be inclined to believe that there is certainly some causal relationship between his coronary artery disease and the pain which he had complained of at the time of his accident and which has been continuously present since (that) time. * * * It is reasonable to believe that if the patient had a significant narrowing of the coronary arteries due to atherosclerosis, that the effort which is required in the pulling of such a heavy pump as he was using could well be sufficient in itself to precipitate acute pain in his chest. I am of the opinion that this man did suffer a small coronary occlusion on November 8, 1957, with a small myocardial infarction and that he has also evidence of a rather marked degree of coronary insufficiency which is due to coronary atherosclerosis. * * * I do not feel * * * that this patient will ever be able to return to any type of employment which requires any unusual amount of physical exertion."
The above report obviously damaged the defendant's case, therefore on November 23, 1959, Dr. Nix was requested to appear on behalf of defendant to evaluate the seven X-rays and the cardiogram taken at the suggestion of Dr. Di Cristina at the Montelepre Hospital. Briefly, he conceded only on the basis of what the other doctors found, that it was unlikely that the plaintiff had incurred an acute coronary occlusion, but it could not be ruled out simply because plaintiff did not manifest all of the classic symptoms thereof; however, he very carefully pointed out that the cardiogram did reveal the possibility of a posterior septal infarction in the past.
In concluding, Dr. Nix emphasized that he did not retract his diagnosis which was predicated on his tests to the effect that it was his opinion that plaintiff had suffered a coronary occlusion while attempting to pull the pump which resulted in some kind of myocardial infarction.
The plaintiff initially insisted upon recovering compensation for total and permanent disability for 400 weeks, however, in the course of oral argument before this court, his counsel informed us that he desired to limit the claim for compensation to the period from the date of the injury to plaintiff's death, less nine weeks compensation previously paid.
Plaintiff's and defendant's counsel both stipulated that the balance of the medical expenses amounted to the sum of $262, rather than $1,000 as awarded in the judgment of the lower court.
Plaintiff's counsel requested the imposition of penalties and attorney's fees, predicated *302 on the fact that the defendant acted arbitrarily, capriciously and without probable cause in refusing to resume payment of compensation to the plaintiff within sixty days after receipt of Dr. Nix's report which constituted satisfactory proof of plaintiff's disability resulting from the accident.
An examination of this record discloses that the defendant acted reasonably in its refusal to pay compensation, therefore, its conduct was not arbitrary and capricious so as to incur the imposition of penalties and attorney's fees.
The trial court awarded plaintiff the sum of $2,000 attorney's fees, but did not as a condition precedent, impose 12% penalties upon the defendant for arbitrarily refusing to pay compensation. In view of what we have said hereinabove, we believe this was error.
The foregoing factual recitation reveals that the fundamental question posed for our consideration is whether plaintiff's disability was caused by an accident arising out of and in the course of his employment.
The burden of proof, of course, of the causal connection between the accident and the resulting disability must always be successfully borne by the plaintiff.
We are convinced that the plaintiff has proven this causal connection with that reasonable certainty required by the existing law and the jurisprudence interpretative thereof.
In a relatively recent case[4] we expressed the opinion, even though that decision was adverse to the plaintiff, that:
"There is no doubt that recovery can be had in the case of a fatal heart attack even though the condition was progressive and pre-existing, if the last attack was brought on acutely as a result of overwork, pressure, fright, unusual exertion, even though actual death occurred at a later date and away from the employment.

* * * * * *
"While a heart attack is not an accident within the purview of the Workmen's Compensation Law[5], yet if an employee has a pre-existing heart condition which is aggravated by his work, excessive heat, intense hard labor, sudden fright or attack, or any other stress that might aggravate such condition and cause disability or death, such resulting disability or death would be compensable under the Workmen's Compensation Law."
For the reasons assigned, the judgment of the lower court insofar as it awards plaintiff attorney's fees in the amount of $2,000 is reversed.
It is amended insofar as it awards judgment in favor of James L. Spivey, plaintiff, and against the defendant, Aetna Casualty and Surety Company, condemning the defendant to pay to petitioner workmen's compensation at the rate of $35 per week for a period of 400 weeks; and as amended, it is now ordered that there be judgment in favor of plaintiff, Mrs. Maudie Pearl Spivey, and against the defendant for compensation at the rate of $35 per week for the period of November 8, 1957, through September 24, 1960, subject to a credit of nine weeks compensation previously paid, together with legal interest from judicial demand until paid.
The judgment is further amended insofar as it awards medical expenses to the plaintiff in the amount of $1,000; and as amended, it is now ordered that there be judgment herein in favor of plaintiff and against defendant for medical expenses in the amount of $262.
In all other respects the judgment is affirmed, the defendant is to pay all costs.
Reversed in part, amended in part, affirmed in part.
NOTES
[1] Compensation had been paid for nine weeks at the rate of $35 per week, or a total of $315.
[2] Medical expenses had been paid in the amount of $393.91.
[3] For convenience we shall hereinafter refer to Spivey as plaintiff.
[4] Kraemer v. Jahncke Services, La.App., 1955, 83 So.2d 916, 918.
[5] LSA-R.S. 23:1021 et seq.